UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC GUNNELS,

                Plaintiff,                      No. 15-cv-12170

vs.                                    Hon. Gerald E. Rosen

ROBERT KENNY, STUART
WORTHING, ROY HATCHETT,
ERIC ECKLES and JASON
PLETSCHER,

                Defendants.
_____/

OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on September 30, 2016

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

## I. INTRODUCTION

Plaintiff Eric Gunnels has brought this § 1983 action alleging "search and seizure

without probable cause" based upon a search pursuant to a judicially-obtained search

warrant of property owned by him in Clio, Michigan for suspected violations of the

Michigan Building Code on February 12, 2014.  Following the close of the six-month

1

discovery period, Defendants filed the instant Motion for Summary Judgment. Plaintiff has responded and Defendants have replied.

Having reviewed and considered the parties' briefs, supporting documents, and the entire record of this matter, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

PERTINENT FACTS

Plaintiff Eric Gunnels purchased property located on North Lewis Road in Clio, Michigan in 2013. The building, which was vacant when Gunnels bought it, was previously a hardware store, with attached living quarters. When Gunnels purchased the property, all of the hardware implements and shelving units and racks that were in the previous hardware store were still inside the building. [Gunnels 1/21/16 Dep., p. 19]. Gunnels intended to rent out the store-front area for another hardware store or some other business, and live in the back area residence himself. *Id.* at 17. In January - February 2014, Gunnels, with the help of his father and some friends, worked on getting the property habitable. *Id.* at 57.

On January 22, 2014, Gunnels found a "building inspector notification" sticker on the door of the property with the name and phone number of the Thedford Township building inspector, Stuart Worthing, on it, and a handwritten note from Worthing asking

2

Gunnels to contact him. *Id.* at 70-73. Gunnels called Worthing later that same day but he did not answer, so Gunnels left him a voicemail message telling him he had called. *Id.*

Worthing called Gunnels back early the following week. *Id.* at 69. According to Gunnels, in that first phone conversation, Worthing told him that it was his understanding that Gunnels was doing construction on his property and Worthing asked if there was anything Gunnels needed help with or if he would like to schedule a time for Worthing to come in and take a look at what he was doing. *Id.* Gunnels said he told Worthing that he had not done any construction work that required a permit and that at the time he was just doing "cosmetic stuff. . . patching drywall and painting." *Id.* According to Gunnels, Worthing merely responded, "Okay," so no appointment was made for him to come inspect the property. *Id.*

The following week, Worthing called Gunnels again. *Id.* at 75. Worthing told Gunnels in that second conversation that he noticed a dumpster had been placed in front of the premises. *Id.* Gunnels told Worthing that he was just throwing away garbage that was inside the building. *Id.* Worthing again asked whether Gunnels had done any construction to which Gunnels again replied, "no," that he was just doing "painting and carpeting." *Id.* at 75-76 According to Gunnels, Worthing once again just said, "All right. Thanks. That's all I needed to know." *Id.* at 75. Worthing then asked Gunnels if he wanted Worthing to do a "walk through inspection" at that time, and Gunnels once

3

again declined the offer, reiterating that he had not done any construction that required a permit. *Id.* at 78.

Two weeks later, on February 12, 2014, while Gunnels was outside shoveling snow, Stuart Worthing arrived at the premises and asked if he could do a walk through. *Id.* at 79. Gunnels refused. *Id.* at 80. Worthing informed Gunnels that under the building code he has the right to enter any building under construction to which Gunnels responded, "I'd like to see where it says that." *Id.* According to Gunnels, Worthing told him that he would leave a copy of the code provisions in his mailbox at the township offices. *Id.*[1]

Worthing then left the premises but said he would be back in 20 minutes. *Id.* at 82.

Approximately 20 minutes later, Worthing returned accompanied by Officer Eric Eckles in a separate vehicle. *Id.* According to Gunnels, Worthing stepped out his car and immediately demanded to search the premises. *Id.* Gunnels said he asked Worthing why he wanted to search the property, to which Worthing replied "because I have complaints that you're doing construction without a permit." *Id.* at 83. Gunnels testified that he told Worthing once again that he was not doing any construction that required a permit and refused to allow him to enter the premises. *Id.* According to Gunnels,

---

[1] Gunnels is on the Thedford Township Board of Trustees and a member of the Township Planning Commission, and therefore, has a mailbox in the township building.

4

Worthing's reaction to his refusal was merely to say, "Okay, Eric, just so you know it's nothing personal," and Gunnels responded "likewise, it's nothing personal against you either." *Id.*

After this conversation, Worthing left, but Officer Eckles remained -- he parked his car across the street and stayed there for approximately four hours. *Id.* at 89.

During that time, Gunnels and two of his friends laid carpet inside the house but took a dinner break during which Gunnels went out to get a pizza and brought it back to the house, stopping briefly to offer a slice to Officer Eckles. *Id.*

Gunnels said that Eckles looked uncomfortable, and when Gunnels asked him why he was parked there, Eckles told him he was "waiting on some 911 call." *Id.* at 92. Shortly thereafter, Eckles received a text message. *Id.* at 92-93. Gunnels testified that he did not see what was on the text, but that Eckles told him the message was from the chief of police, and said "they suspect marijuana." *Id.* at 94. Gunnels admitted, however, that he did not know who was the "they" Eckles referred to but assumed it was the chief. *Id.* at 95.

Gunnels returned to his building and, a short while later, Police Chief Robert Kenny arrived in his personal vehicle, with Stuart Worthing following in his own car. *Id.* at 98-99. Worthing parked across the street behind Officer Eckles and Chief Kenny parked at the edge of Gunnels' driveway. *Id.* Worthing then left his car and joined Chief Eckles in his vehicle where the two men remained for approximately 45 minutes. *Id.*

5

When Gunnels saw the car parked at the edge of his driveway, Gunnels exited his building and Kenny exited his vehicle and approached Gunnels. *Id.* at 100. According to Gunnels, Kenney said to Gunnels, "Eric, I really think this is bullshit. Why didn't you just let him search?" to which Gunnels replied, "I think someone in your department needs to have their ego put in check." *Id.* Gunnels said that Kenny then told him they were in the process of obtaining a search warrant, and walked back to his car. *Id.* Gunnels returned back inside of his building. *Id.* A short while later, Officers Jason Pletscher and Roy Hatchett arrived with the search warrant and gave Gunnels a copy of it. *Id.* at 101. The officers then entered the building and Gunnels followed. *Id.* Chief Kenny also entered the premises. *Id.* Gunnels' father and two of his friends were in the building with Gunnels at the time. *Id.*

According to Gunnels, the officers were in the building looking around for about an hour. *Id.* at 102. During this search, Chief Kenny observed that the two inner doors separating the business portion of the building from the residence had been screwed shut. *Id.* Gunnels testified that he had screwed the doors shut when he realized the officers were getting a search warrant. *Id.* at 103. He testified,

> I didn't know how these things worked, so I just -- that was my way of locking that door in -- you know, in case they had to pull a permit or a search warrant for a separate building because I didn't know if it was -- they were pulling a search warrant [only[ for the commercial aspect of the building where I was doing the carpeting and the painting or whether they wanted to search my entire residence. I considered them to be two separate things. . . .

6

*Id.* at 102-104.

Chief Kenny got a drill and removed the screws.  *Id.*

Once the doors were opened, officers observed open wall cavities, and plumbing and electrical fixtures removed.  [Worthing Dep., p. 40].  A jack was also observed holding up a structural beam.  *Id.*[2]  All of these constituted building code violations.  *Id.* at 41; *see also* Defendants' Ex. 5, 2009 Michigan Building Code R105.1.  Although the officers could have issued Gunnels a citation, they did not.  [Gunnels Dep., p. 107.]  However, two days later a "stop work order" was placed on the building, directing that work on the building be ceased and revoking the certificate of occupancy.  *Id.*

Gunnels testified that he never attempted to respond to the building inspector about the stop work order.  *Id.*  Instead, he spoke with a supervisor who told him that, to get the stop work order lifted, he would have to pull a building permit and get a structural engineer's approval.  *Id.* at 108.

Gunnels did not pull a permit or take any further action with the township or the building inspector.  Instead, on June 16, 2015, he filed this § 1983 lawsuit claiming that the search of his property and the resulting stop work order amounted to an unlawful search and seizure.  On February 29, 2016, after the close of discovery, Defendants filed this Motion for Summary Judgment.

---

[2]  A jar of marijuana was also found in the premises. [Gunnels Dep., p. 95-98.] However, Gunnels has a medical marijuana permit, and marijuana was neither the basis for nor the object of the search.

7

## II. DISCUSSION

A.   APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal

8

quotation marks, and citation omitted).  The Court will apply the foregoing standards in deciding Defendants' motion for summary judgment in this case.

B.    THE SEARCH OF PLAINTIFF'S PREMISES WAS CONDUCTED PURSUANT TO A VALID SEARCH WARRANT

Plaintiff claims in his one-count Complaint that his Fourth Amendment rights were violated when the police officers searched his premises and a "stop work order" issued for his property.  The sole basis for his claim is that the search warrant issued for the search of the premises was invalid because it was issued pursuant to an affidavit that contained a false statement that Plaintiff was the owner of a medical marijuana dispensary.  *See* Affidavit and Application for Search Warrant, Defendants' Ex. 3, ¶ 8 ["[Y]our affiant has known since 2012 that Eric Gunnels was the owner of a medical marijuana dispensary known as the Coinsurer of Cannabis, located at the corner of Dort Highway and Frances Rd. in Thedford Township."]  At his deposition Plaintiff denied ever having any ownership interest in the Coinsurer of Cannabis marijuana dispensary, although he admitted he is friends with the people who do own the facility and that prior to February 2012 he "frequented there" at least once a week to "socialize."  [Gunnels Dep., pp. 96-97.]

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.  Where there is a search warrant issued by a neutral and detached magistrate or judge, indicating that

9

there is probable cause for the search, officers who rely on that warrant and its finding of probable cause are generally insulated from liability pursuant to § 1983 for Fourth Amendment violations. *See Hale v. Kart*, 396 F.3d 721, 725 (6th Cir.2005). However, "an officer cannot rely on the judicial determination of probable cause if that officer knowingly makes false statements and omissions" necessary to the finding of probable cause. *See Yancey v. Carroll County, Ky*., 876 F.2d 1238, 1243 (6th Cir.1989).  An officer who obtains a search warrant by making materially false statements in the affidavit on which the warrant is based may be liable to a plaintiff injured by the warrant if plaintiff demonstrates that (1) the officer made the false statements knowingly and intentionally or with a reckless disregard for the truth *and* (2) setting aside the false statements, the remainder of the affidavit is insufficient to establish probable cause. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.1989) (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)) (emphasis added); *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) ("A warrant is invalid if the officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions in a warrant application and such statements or omissions were... necessary to the finding of probable cause." (internal citations and punctuation omitted)).  *See also, Young v. Owens*, 577 F. App'x 410, 416 (6th Cir. 2014) (holding that to overcome an officer's qualified immunity from § 1983 liability "a plaintiff must establish (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and

(2) that the allegedly false or omitted information was material to the finding of probable cause"); *Ghaster v. City of Rocky River*, 913 F. Supp. 2d 443, 464-5 (N.D. Ohio 2012). Plaintiff here cannot make the requisite showing.

Accepting as true, as the Court must, Plaintiff's denial of owning the Coinsurer of Cannabis, Plaintiff cannot make a "substantial showing" that Officer Pletscher, who swore out the search warrant, stated a "deliberate" falsehood since it was not unreasonable for him to believe that Gunnels had an interest in the marijuana dispensary when he admitted that he was good friends with the owner and frequented the marijuana dispensary at least once a week to socialize there.

More importantly, however, even if the Court were to determine that the statement was a deliberate falsehood, Plaintiff cannot show that the allegedly false statement was necessary to the finding of probable cause. Indeed, the ownership of a marijuana dispensary is wholly immaterial to the probable cause determination. The more than page-and-a-half long affidavit more than amply establishes probable cause to search Plaintiff's property for violations of the Michigan Building Code even when the allegedly false statement in Paragraph 8 is extracted. Of relevance here is that the affidavit also states the following:

> 5.     That on 02/12/2014, your affiant was dispatched [to] 13007 N. Lewis Rd., in Thedford Township, Genesee County, Michigan, to meet with Mr. Stuart Worthing, Thedford Township Building Inspector. Mr. Stuart told me that on or about January 22, 2014, he was called to 14007 N. Lewis Rd. to investigate a report that the buildings located on the premises were being remodeled or

11

otherwise altered without a township permit.  Mr. Stuart said that he saw construction materials on the premises and that on that day he left a Stop Work Order at the site.  Further he said the owner, Eric Gunnels, called him on January 28, 2014, and told Mr. Stuart there was only minor painting and carpeting being done on the premises.

6.      That on 02/12/2014, Mr. Stuart Worthing, Thedford Township Building Inspector, told your affiant that he stopped at 14007 N. Lewis Rd. on January 31, 2014, in response to a second call.  Mr. Worthing said that on this occasion he saw construction materials, to-wit: drywall, 2X4 studs, and plywood on the premises.

7.      That on 02/12/2014, Mr. Stuart Worthing, Thedford Township Building Inspector, told your affiant that he stopped at 14007 N. Lewis Rd. on February 12, 2014, at approximately 4:00 PM. Mr Worthing said that he encountered the owner, Eric Gunnels, on the property.  Mr. Worthing said he asked Mr. Gunnels if he could walk through the premises to inspect the work, and Mr. Gunnels refused to let Mr. Worthing enter the building.  Mr. Gunnels told Mr. Worthing that he would not allow him to inspect the property.  Mr. Worthing said that he called Thedford Township Police Chief Bob Kenny to request assistance because of the interference with his duties under Section 104.6, Right of Entry, of the 2009 Michigan Building Code.

***

WHEREFORE, your affiant states that based on the foregoing information he/she has reasonable and probable cause to belief and does believe that the above described premises. . . contain evidence of violations of the Michigan Building Code or criminal conduct, and therefore prays that the Court will issue a warrant directing the Thedford Township Police or any peace office[r] of the State of Michigan to search the place(s) described in paragraph 4, for the above mentioned items, including but not limited to: construction materials, to-wit: drywall, 2X4 studs, plywood, tools and hardware supplies on the premises; also papers and effects showing occupancy, ownership, dominion or control of said premises including but not limited to rent and property receipts, keys, bills, and cancelled mail envelopes and records of remodeling or construction work. . . found in the described location(s); commanding him to search therefore and seize and safely keep and test and analyze, and to make return and tabulation thereof according to law.

[Defendants' Ex. 3.]

Based on the affidavit, the district judge was "satisfied that there is reasonable and probable cause to believe that evidence [establishing] violations of the 2009 Michigan Building code or criminal conduct, more specifically, remodeling or otherwise altering a building without a permit and obstructing the Thedford Township Building Inspection in the lawful discharge of his duties. . . [would be] found [at the premises located] at 14007 N. Lewis Rd.," and hence, authorized the search. [*See* Ex. 4.] There is simply no evidence of record showing that Plaintiff's alleged ownership of a marijuana dispensary played any role in the issuance of the warrant.

For the foregoing reasons, the Court concludes that the warrant, pursuant to which Plaintiff's property was searched, was valid. Therefore, Plaintiff cannot make out a cognizable claim for violation of his Fourth Amendment rights based on the search of his property.

C.   PLAINTIFF WAS NOT "SEIZED" WHILE THE WARRANT WAS BEING OBTAINED

Plaintiff also alleges in his Complaint that Defendants seized "his person" during the time the search warrant was being obtained. A person is seized within the meaning of the Fourth Amendment "where an officer applies physical force to restrain [him] or a show of authority... has in some way restrained the liberty of [the] citizen. If physical force or submission to the assertion of authority is absent, no seizure occurs." *United States v. Ray*, 597 F. App'x 832, 837 (6th Cir. 2013) (citations omitted).

13

Similarly, where the plaintiff is free to flee, there is no seizure. *See e.g., Bennett v. City of Eastpointe*, 410 F.3d 810, 833 (6th Cir. 2005) (where suspect fled instead of submitting to show of authority there is no seizure).

In *O'Malley v. City of Flint*, 652 F.3d 662 (6th Cir. 2011), the plaintiff had parked his vehicle in his driveway and was walking toward his home when the police chief pulled his vehicle directly behind plaintiff's car, blocking the vehicle, and the two talked. The court held that no Fourth Amendment seizure occurred because the plaintiff was not only free to leave his vehicle, he already had left it, and the court found that the brief interaction between the two men was consensual, and hence, not a seizure. *Id.* at 699.

Here, Plaintiff acknowledged that he was not only free to leave his premises but he actually did leave -- he went out to get some pizza. Moreover, as in *O'Malley*, Plaintiff's interactions with Officer Eckles when he was returning home with his pizza and with Chief Kenny were brief and after each interaction, he went on his way. There is simply no evidence that Plaintiff was restrained in any way. Therefore, no seizure of his person occurred.

For the foregoing reasons, the Court concludes that Plaintiff has failed to state any Section 1983 claim upon which relief may be granted. Defendants' Motion for Summary Judgment, therefore, is GRANTED.

*** 

Following Defendants' filing of their Motion for Summary Judgment, and after all

14

briefing was completed, Plaintiff filed a Motion for Leave to File an Amended
Complaint to sue Defendant Police Chief Kenny in his official, as well as his individual
capacity, so as to enable him to add additional claims for injunctive/declaratory relief and
damages for deprivation of civil rights caused by the Township's policy, custom, practice
or procedure pursuant to *Monell*.[3]   The Court will deny this motion because it is untimely
and prejudicial to Defendants, given that the discovery period has long closed and, in any
event, Plaintiff's proposed amendment of his Complaint would be futile.

In *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), the Supreme Court
held that a municipal entity cannot be held liable under a *Monell* theory where there is no
underlying constitutional violation by the individual officer.   The Court held:

> If a plaintiff has suffered no constitutional violation at the hands of the
> individual police officer, the fact that the department regulations might
> have authorized use of unconstitutionally excessive force is quite beside the
> point.

*Id*.  *See also Claybrook v. Birchwell*, 199 F.3d 350, 361 (6th Cir. 2000); *Ross v. Duggan*,
492 F.3d 575, 589-90 (6th Cir. 2004) (holding, as a matter of law, that because Section
1983 plaintiffs could not prove that they suffered any constitutional tort, no liability
could be imposed upon the municipality or the city and county policymakers based on
allegedly unconstitutional policies, practices and procedures);  *S.P. v. City of Takoma
Park*, 134 F.3d 260, 272 (4th Cir. 1998) (assuming training of officers was

---

[3]  *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1985).

unconstitutional, city could not be held liable where no constitutional violation by officers occurred).

Here, the Court has already concluded that Plaintiff has not established that he suffered any constitutional tort, therefore, as a matter of law no liability can be imposed upon the Township of the Township policymakers based on allegedly unconstitutional policies, practices and procedures. Allowing Plaintiff to file an amended complaint to add such claims would, therefore, be futile. Therefore, Plaintiff's Motion for Leave to File an Amended Complaint will be DENIED.

<u>CONCLUSION</u>

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment **[Dkt. # 20]** is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to File an Amended Complaint **[Dkt. # 25]** is DENIED.

Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED, in its entirety, WITH PREJUDICE.

Let Judgment be entered accordingly.

s/Gerald E. Rosen
United States District Judge

Dated: September 30, 2016

16

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 30, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135